UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER HALL,

No. 04-73548

               Petitioner,

District Judge Denise Page Hood

v.

Magistrate Judge R. Steven Whalen

DOUG VASBINDER, Warden,

               Respondent.

_____/

## REPORT AND RECOMMENDATION

     Petitioner Christopher Hall has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254. The matter has been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons that follow, we recommend that the Petition be GRANTED and that a conditional writ of habeas corpus issue.

## I.   PROCEDURAL HISTORY

     Petitioner was found guilty by a jury in the Kalkaska County Circuit Court, the Honorable Alton Davis, presiding, of one count of second-degree criminal sexual conduct (CSC), M.C.L. 750.520b; one count of obstruction of justice, M.C.L. 750.505; and one count of conspiracy to obstruct justice, M.C.L. 750.505, 750.157(a). He was sentenced to 96 to180 months for the CSC and 40 to 60 months for the conspiracy and obstruction counts, to run concurrently.

     Petitioner filed an appeal as of right to the Michigan Court of Appeals, which affirmed his conviction on April 15, 2003, and denied rehearing on June 1, 2003. The Michigan Supreme Court denied leave to appeal on April 15, 2004.

     On September 15, 2004, Petitioner filed his Petition for Writ of Habeas Corpus in

this Court, raising the following issues:

I.     THE FIFTH AMENDMENT PRIVILEGE AGAINST SELF
       INCRIMINATION WAS VIOLATED WHERE THE PROSECUTOR
       ELICITED EVIDENCE OF DEFENDANT'S SILENCE IN PRIOR
       PROBATE COURT PROCEEDINGS AND THEN ARGUED TO THE
       JURY THAT IN PROBATE COURT IT WAS "THE GUILTY MAN
       BEING WHISPERED TO BY HIS LAWYER" WHO DID NOT TESTIFY
       THERE.  U.S. CONST. AMEND. V AND IV.

II.    IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE BECAME
       THEMES AND WERE THE REPEATED FOCUS OF THIS TRIAL
       WHERE THE IMPROPER EVIDENCE ENHANCED THE
       PROSECUTION AND DESTROYED THE DEFENDANT'S RIGHT TO
       A FAIR TRIAL.  U.S. CONST. AMEND. V, VI AND IV, MICH. CONST.
       1963 ART. 1, §17, 20.

III.   WHERE THE PROSECUTOR EXTENSIVELY BERATED
       DEFENDANT'S CHARACTER BEFORE THE JURY WITH
       IMPERMISSIBLE EVIDENCE AND ARGUMENT TO THE JURY, A
       NEW TRIAL IS REQUIRED.

IV.    WHERE THE SENTENCING JUDGE FAILS TO RESOLVE
       OBJECTIONS TO THE SENTENCE INFORMATION REPORT
       (SIR)AND WHERE THE SENTENCE FOR CSC II AND
       OBSTRUCTION OF JUSTICE IS DISPROPORTIONATE TO THESE
       OFFENSES AND TO THE OFFENDER, THERE IS AN ABUSE OF
       SENTENCING DISCRETION REQUIRING RESENTENCING.

V.     DEFENSE COUNSEL'S FAILURE TO OBJECT TO IMPROPER
       EVIDENCE AND PROSECUTORIAL MISCONDUCT WAS
       CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL.
       U.S. CONST. AMEND. V, VI AND XIV.

## II.    FACTS

### A.    TESTIMONY ADDUCED AT TRIAL

Following a jury trial, Petitioner was convicted of second-degree criminal sexual

conduct, obstruction of justice and conspiracy to obstruct justice.  The charges arose out

of alleged sexual improprieties involving his daughter, Ashley Owen, in August of 1998.

Ashley Owen, who was 12 years old in 1998, testified that at the time, she lived

with her father (the Petitioner) and step-mother (Dondrea Hall) in Charlotte, Michigan.

She said that around August 15th of that year, she took a weekend trip to her grandparents' house in Kalkaska, Michigan, with the Petitioner, Dondrea, her sister Alex, her step-brother Jordan, her step-sister Jericka, and her friend Amber (Tr. I, 292-94).[1]  On Saturday of that weekend, she suffered a slight accident on an all-terrain vehicle, and that night, while the family was watching television, the Petitioner gave her a back rub.  She testified that the Petitioner, Alex and Amber were in the room with her watching television, while her grandmother and Dondrea Hall were at the dining room table, a short distance away and able to see her.  Alex and Amber were only a couple of feet away. Ashley said that at some point during the back rub, the Petitioner started massaging her breast, and continued to squeeze and rub her breast for four or five minutes (T.I, 303-309).  She testified that her grandmother, Janet Hall, told the Petitioner to leave her alone and go to bed.  She said that Petitioner appeared to be drunk at this time (T.I, 309-310).

Ashley testified that the next morning, she told Dondrea what had happened, and that Dondrea in turn talked to Petitioner.  They drove back to Charlotte that day, and Petitioner told her that he was sorry, that they would make sure it never happened again, and that he would never again drink all day.  She took this to mean that he was apologizing for drinking, not for fondling her (Tr.I, 311-13).  The Petitioner did not tell her at this time not to talk to anyone about what happened (Tr.II, 23).

In December of 1998, the family again went to Kalkaska, and when they returned, Ashley told her birth mother, who lived in Kansas, what had happened the previous August.  Her mother instructed her to tell a school counselor, which she did (Tr. I, 314-

---

[1] T. I refers to the trial transcript of 4-17-00.
T. II refers to the transcript of 4-19-00.
T. III refers to the transcript of 4-20-00.
T. IV refers to the transcript of 4-24-00.

318).  Subsequently, Ashley spoke to Det. Kellogg of the Michigan State Police and Marie Iott of the Family Independence Agency (FIA).  The following day at school, while Ashley was waiting in a school office to talk with Iott again, Dondrea came in, said that she had to leave for a doctor's appointment, and drove her home (Tr.I, 319-21).  Dondrea yelled at her, she said, and telephoned the Petitioner, who came home from work (Tr. 322, 324).

Then, Ashley, Petitioner and Dondrea drove to the office of Victoria Easterday, an attorney.  Petitioner and Dondrea waited in a conference room while Ashley talked to Easterday privately about what had happened.  When they returned to the conference room, Easterday informed the Petitioner of the legal consequences if he were found guilty. According to Ashley, the Petitioner was crying, and said that he did not remember doing it. Ashley testified that Easterday told her that it would be a good idea for her to write a letter to Det. Kellogg to the effect that she made the whole thing up (Tr.I, 325-28). Ashley said that she did not want her father to get into trouble, and felt intimidated (Tr.I, 330)

Ashley testified that that evening at home, she wrote the letter as Dondrea watched her.  Dondrea then took the letter and read it over the phone to Easterday (Tr.I, 330-31). Afterward, Dondrea showed the letter to Petitioner (Tr.I, 333).  However, Ashley hid the letter under her mattress because she did not want it to be sent.  Three drafts of the letter were admitted as an exhibit.

Following a Probate Court hearing, Ashley was placed in foster care for a few days, and then went to live with her mother in Kansas. She testified that while in Kansas, her grandfather telephoned her and told her not to talk to anyone (Tr.I, 344-46).

Janet Hall, the Petitioner's step-mother (Ashley's step-grandmother) was present at

-4-

the Kalkaska house at the time of the incident in August of 1998.  She testified that around 10 or 11 p.m., Petitioner was giving Ashley a back rub (Tr.II, 110-11).  At the time, Ms. Hall and Dondrea were at the kitchen table.  The Petitioner, she said, was pulling at the girls' legs, and generally, they were all making a lot of noise and "raising cain." (Tr.II, 112-15).  She said that she was in a position to see the Petitioner and Ashley, but did not see Petitioner put his hand under Ashley's chest or fondle her (Tr.II, 151, 153).  She told the Petitioner to go to bed because he and the four children were making a lot of noise (Tr.II, 154).

Michigan State Police Trooper Janet Watson interviewed Janet Hall on December 17, 1998.  According to Trooper Watson, Ms. Hall said that the Petitioner drank heavily during the August visit, and that if the Petitioner's behavior continued, all of the girls in the household would be potential victims (Tr.II, 172-73).  Ms. Hall told the Trooper that she saw the Petitioner give Ashley a back rub, but did not actually see her fondle Ashley's breast (Tr.II, 175).

Heidi Vandenberg, a school social worker in Grand Ledge, Michigan, testified that in December of 1998, Ashley told her that her father drank a lot, and that the previous summer, he had touched her on the chest.  Vandenberg referred Ashley to a school counselor (Tr.II, 188).

Marie Iott, from the state Protective Services Agency, sat in on an interview of Ashley conducted by Det. Kellogg of the Charlotte Police Department.  The interview lasted about 45 minutes, but the next day, Ashley refused to be interviewed again (Tr.II, 241-44).  Iott filed a petition to remove Ashley and her two sisters from their home, and on December 18, 1998, a Probate Court hearing was held.  Present at the hearing were Petitioner, Ashley, Dondrea, Iott and Det. Kellogg.  She said that all parties, including the

Petitioner, were represented by counsel, and that everyone present had the opportunity to argue their positions or contest the proceedings (Tr.II, 250-52). Following the hearing, Ashley and her two sisters were placed in foster care (Tr.II, 254).

Prior to the testimony of Dondrea Hall, and outside the presence of the jury, the prosecutor argued for the admission of evidence regarding a 1994 or 1995 incident involving allegations of Petitioner's sexual improprieties with another daughter. Petitioner's counsel objected. Although the trial judge remarked that "you'd have to be a screaming idiot" not to realize the impact such evidence would have on the jury, he admitted the evidence for the limited purpose of showing Dondrea's motivation for pressuring Ashley to keep quiet about her allegations. The judge stated that he would give a cautionary instruction on request (Tr.III, 4-5).

Dondrea Hall testified for the prosecution pursuant to an agreement under which the obstruction of justice charge against her would be dismissed (Tr.III, 8-9). She acknowledged that dismissal of the charge would remove the threat that her youngest daughter, Jericka, would be taken from her in a pending Eaton County proceeding (Tr.III, 81).

Regarding the incident in August, 1998, Dondrea testified that around 10 or 10:30 p.m., everyone was watching television, and Petitioner was giving Ashley a back rub. After 10 or 15 minutes, she told Petitioner to keep his hand off the girls because he was "harassing" Alex, Ashley's sister (Tr.III, 17-19). She said that she did not think anything was wrong during the back rub (Tr.III, 20). The next morning, Ashley told her that the Petitioner had touched her breast, and was upset about it. Dondrea talked to the Petitioner, who said that he did not remember doing it, but that if he did, he was sorry. The three of them went for a walk, she said, and the Petitioner apologized for drinking all

day (Tr.III,20-22).

Dondrea testified that she told Ashley not to tell her mother, because she had "been through previous experiences" involving Petitioner and his older daughter Heather, and thought it might turn into "a big thing" again (Tr.III, 23-24).

In December of 1998, following another family trip to Kalkaska, Petitioner told Dondrea that a State Trooper had talked to him. Dondrea pulled Ashley out of school, telling school officials falsely that Ashley had a medical appointment (Tr.III, 26-28). Dondrea said that at home, both she and Petitioner were trying to manipulate and intimidate Ashley. She said that when Petitioner learned that Ashley had talked to the police, his response was, "What can we do so there's no charges brought up?" (Tr.III, 33-34). They all went to attorney Victoria Easterday's office, where Petitioner again asked what could be done to avoid charges being brought. Dondrea testified that Easterday came up with the idea of Ashley writing a letter saying that nothing happened. She said that Easterday told Ashley not to tell anyone that it was her idea to write the letter (Tr.III, 34-36).

That evening, Dondrea asked Ashley if she wanted to write the letter, and told Ashley that she had to provide Det. Kellogg with a reason she lied. After Ashley completed a third draft of the letter, Dondrea called Easterday and read her the letter. Easterday said to give the letter to her, but she did not, because she knew it was false. She also discussed the letter with Petitioner (Tr.III, 37-40).

On cross-examination, Dondrea testified that between August and December of 1998, Ashley seemed to act normally around her and the Petitioner. She also described a letter she wrote to her attorney, in which she said that she never saw Petitioner touch Ashley's chest. She wrote that the following morning, Ashley said that it was an

accident, and that the Petitioner had "grazed" the side of her breast (Tr.III,50-55). Dondrea testified that she did not recall if Petitioner told her to go to the school to get Ashley, and that the Petitioner did not force her or Ashley to go to Easterday's office (Tr.III, 63-64).

Outside the presence of the jury, the judge indicated that the jurors had sent a note with two questions. First, they wanted to know about the earlier incident with Petitioner's older daughter. Second, they wanted to know what Ashley said the morning after the incident (Tr.III, 93-94). When the jurors returned, the judge gave them a cautionary instruction regarding the prior incident. Dondrea then testified that in 1995, Petitioner was accused of "sexual improprieties" with his oldest daughter. Dondrea further testified that the morning after the August, 1998 incident, Ashley said that the Petitioner had touched the side of her breast, and it made her uncomfortable. Dondrea testified that Ashley did not say that Petitioner squeezed or manipulated her breast (Tr.III, 101-104).

Charlotte Police Det. Robert Kellogg testified that because the offense was alleged to have occurred outside his jurisdiction, he turned the case over to the State Police (Tr.III, 137). He said, however, that he was present at a custody hearing in December of 1998, and that he was the only witness to testify there. He said that the Petitioner was represented by counsel (Victoria Easterday), and that everyone had the opportunity to testify. When asked by the prosecutor whether the Petitioner testified at the hearing, Kellogg answered, "No, he didn't." (Tr.III, 142). Petitioner's trial counsel did not object to this questioning.

Amber Stiver, Ashley's friend, testified for the defense. She was with Ashley and her family at the Kalkaska house in August, 1998, and saw the Petitioner give Ashley a back rub, but nothing else. Ashley said nothing to her about an incident until a couple of

months later, when she said that the Petitioner had touched her on the breast (Tr.III, 153-56).

Arthur Hall was Petitioner's father and Ashley's grandfather. He was present during the August incident, and was seated about four or five feet away while Petitioner was giving Ashley a back rub. He said there was a lot of noisy horseplay going on between Petitioner and the other kids, but he did not see Petitioner move his hands toward Ashley's breast (Tr.III, 168-71).

Petitioner Christopher Hall testified in his own defense. He said that he did not engage in any sexual conduct with Ashley in August of 1998; that he did not obstruct justice by preventing Ashley from making a statement; and that he did not conspire with Victoria Easterday and Dondria to prevent Ashley from making a statement or coerce her into making a false statement (Tr.III, 201-202).

Petitioner testified that on the night in question, he gave Ashley a back rub, and that they were all "horsing around," but that he did not touch Ashley's breasts, and did not put his hands in the area of her breasts at all, much less for five or ten minutes (Tr.III, 222-24). The next morning, he said, Dondrea spoke with him, saying that Ashley was upset because, she said, he had "grazed" the side of her breast. Petitioner then spoke with Ashley, saying that he did not remember doing anything, but if that was what happened, he apologized (Tr.III, 225-27).

Petitioner testified that he called attorney Easterday because he didn't know what to do (Tr.III, 243). He said that at the office, Easterday and Ashley talked privately, and when they all returned to the conference room, Easterday informed him that "what Ashley told [her] was not a crime," but that the worse case scenario was that Petitioner could be charged with CSC II. When Petitioner asked what they could do, Easterday said that he

or Ashley could write a letter stating what really happened. When Petitioner suggested that he could talk to the police, Easterday said, "Not without me" (Tr.III, 245-48).

Later that night, at home, Dondria handed Petitioner a letter that Ashley had written. Petitioner said that he glanced at it, then handed it back to Dondria (Tr. 251-53).

On cross-examination, the prosecutor asked the Petitioner why he did not testify at the Probate Court hearing. The following exchange occurred:

> Q (by prosecutor): ...Why didn't you testify at that hearing, Mr. Hall?
>
> A (by Petitioner): It went quick. Everything was just- - there was a room full of attorneys, and a room not much bigger than that...jury box, and we were all crammed in there. And it was just bang, bang, bang. *And I asked Vic [attorney Easterday] if I could say anything, and she said, 'I'd recommend you didn't say nothin'.*"
>
> Q: Oh. I see. So, it wasn't that you didn't have a chance. It wasn't that you couldn't talk. It wasn't that all this process went on without any opportunity for you. *It's that you didn't and your lawyer told you not to.* That's what happened, right?
>
> A: She said, 'I suggest you didn't." (Tr.III, 289-90)(emphasis added).

Petitioner's trial counsel did not object to this questioning.

In his closing argument to the jury, the prosecutor made the following statements regarding Petitioner's failure to testify at the Probate Court hearing:

> "...[A]nd probably most striking of all was the discovery for all of us that at that process that was portrayed as being so sinister and unfair the Defendant was there with his attorney, *who sat there silent and made no objection and made no statement and offered no testimony at all, who stood there and what did he do? Hid from the proceedings, he hid from the proceedings, he did not say a word while this was going on. He cowered in fear of discovery for what he had done and what he did that week to try to thwart this investigation. That's what happened that Friday; it was the guilty man in Court being whispered to by his lawyer saying don't get involved in this, they might find something out*" (Tr.IV, 14)(emphasis added).

The Prosecutor also referenced Det. Kellogg's testimony that "[t]he Defendant made no statement at the [Probate Court] hearing, even though he could" (Tr.IV., 26).

In his rebuttal closing argument, the prosecutor stated as follows:

> "I'd ask you this, how long does it take to prepare if all you're gonna do is go in there and tell the truth? How big of a deal is it to go somewhere and answer a few questions if it's the truth? It's not a big deal. What's a big deal is if it's a lie and you've gotta cover all the bases and get to everybody and put something together. That's why the Defendant didn't testify at that hearing that Friday because they hadn't been able to get Victoria [attorney Easterday] up to get the grandparents handled and get all- -get everything nailed down yet. He had to stay out of it because everybody didn't have their stories straight. *That was guilt working there and guilty knowledge.* The truth is always the truth, it's the truth the minute you're asked; you don't have to get it straight, it is straight" (Tr.IV, 114-15)(emphasis added).

Petitioner's trial counsel did not object to any of the prosecutor's comments.

## B.  MICHIGAN COURT OF APPEALS DECISION

On direct review, the Michigan Court of Appeals, in an unpublished *per curiam* opinion, acknowledged that "[t]his case presented a credibility contest." Addressing the prosecutorial misconduct and the Fifth Amendment arguments, the court found that the prosecutor's remarks in closing argument, regarding the Petitioner's failure to testify at the Probate Court hearing, and his presentation of testimony that Petitioner remained silent at the hearing, were improper:

> "Viewed in context, we conclude that the testimony elicited by the prosecutor and prosecutor's remarks at closing argument were improper. The United States Constitution and Michigan's 1963 Constitution both provide individuals the right to remain silent to avoid being compelled to serve as a witness against themselves. US Const, Am V; Const 1963, art 1, §17."

However, because trial counsel had not objected, the court reviewed this issue for plain error, and found the error to have been harmless "in light of the overwhelming evidence that was properly admitted from which the jury could find defendant guilty beyond a reasonable doubt."

Regarding the ineffective assistance of counsel issue, the Court of Appeals found that "[f]or the reasons previously discussed in this opinion, we conclude that defendant

has not demonstrated that he was prejudiced by his trial counsel's performance and has

not overcome the presumption that his trial counsel rendered effective assistance."[2]

## III.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this

Court's habeas corpus review of state court decisions.  Specifically, 28 U.S.C. §2254(d)

provides:

> "(d) An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless the
> adjudication of that claim - -
>
> a.    resulted in a decision that was contrary to, or
> involved in unreasonable application of, clearly
> established Federal law, as determined by the
> Supreme Court of the United States; or
> b.    resulted in a decision that was based on
> unreasonable determination of the facts in light
> of the evidence presented in the State court
> proceeding."

In *Williams* v *Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the

Supreme Court held that in order to justify a grant of habeas corpus relief under the

AEDPA, a federal court must find a violation of law "clearly established" by holdings of

the Supreme Court, as opposed to its dicta, as of the time of the relevant state court

decision.  *Williams*, 529 U.S. at 412.   Under subsection (d), habeas relief may not be

granted unless (1) the state court decision was contrary to established federal law, or (2)

the state court decision involved an unreasonable application of clearly established

---

[2] The Court of Appeals' opinion stated that the Petitioner "did not move below for
a new trial or a *Ginther* hearing (i.e., a hearing on ineffective assistance of counsel).
However, the Court failed to note that Petitioner's appellate counsel filed a timely Motion
to Remand for that purpose, pursuant to MCR 7.211(C)(1).  A panel of the Court of
Appeals denied that motion in a boilerplate order.  The filing of a motion for new trial or
any post-conviction trial court motion is not a prerequisite to filing a Motion to Remand.

federal law.  *Williams* held that a state court decision is "contrary to" clearly established

federal law "if the state court arrives at a conclusion opposite to that reached by this court

on a question of law or if the state court decides a case differently than this court has on a

set of materially indistinguishable facts."  *Id* at 413.  *Williams* further held that a state

court decision will be deemed an "unreasonable application" of clearly established federal

law "if the state court identifies the correct governing legal principle from this court's

decisions but unreasonably applies that principle to the facts of a prisoner's case."  *Id*.  In

*Brown v. Payton*, 544 U.S. 133, 141, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2005), the

Supreme Court stated that a "state court decision involves an unreasonable application of

this Court's clearly established precedents if the state court applies this Court's

precedents to the facts in an objectively unreasonable manner."

 *Williams* also made it clear that under the "unreasonable application" clause of

§2254(d), it is not necessary that the controlling Supreme Court case be factually on all

fours with the case under review.  Instead, *Williams* held that "a state-court

decision...involves an unreasonable application of this Court's precedent if the state

court...unreasonably refuses to extend that principle to a new context where it should

apply."  *Id.*, 529 U.S. at 412.

## IV.   ANALYSIS

 There are three grounds on which a writ of habeas must be granted to the

Petitioner: (1) the Petitioner was denied his Sixth and Fourteenth Amendment right to the

effective assistance of trial counsel; (2) through the elicitation of testimony and argument

regarding the his failure to testify at the Probate Court hearing, the Petitioner was denied

his Fifth and Fourteenth Amendment protection against self-incrimination; and (3) the

Petitioner was denied his Due Process right to a fair trial through prosecutorial

misconduct. All three grounds implicate the testimony and prosecutorial argument regarding Petitioner's failure to testify at the prior hearing.

## A.    INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment guarantees the accused in a criminal prosecution the right to the effective assistance of counsel. *Strickland* v. *Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  *Strickland*  sets forth a two-part test for assessing claims of ineffective assistance.  First, did the attorney make errors "so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment,"  466 U.S. at 687.  To establish deficient performance under this prong of *Strickland*, the defendant must show that his attorney's representation "fell below an objective standard of reasonableness." *Id.*, at 688. The second prong of *Strickland* examines whether the defendant was prejudiced by counsel's deficient performance.  To meet the prejudice standard, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  at 694.

### i.    Counsel's Failure to Object was Objectively Unreasonable

Trial counsel's inexplicable failure to object to the testimony and the prosecutor's repeated statements to the jury regarding the Petitioner's decision to remain silent at the Probate Court hearing was objectively unreasonable, as there was no conceivable strategic reason for counsel not to object.  Thus, the first prong of *Strickland* is satisfied.

The Michigan Court of Appeals got it at least partly right by holding that the testimony and the prosecutor's comments in closing argument infringed on the Fifth Amendment right against self-incrimination. While the Court of Appeals' discussion was

cursory, the holding was well-grounded in clearly established Supreme Court precedent. In *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court held that "the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." The *Griffin* Court reasoned as follows regarding the fundamental protection against improper prosecutorial commentary on a defendant's exercise of his Fifth Amendment right:

> "For comment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,'...which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." *Id*., 380 U.S. at 614 (internal citations omitted).

Of course, the Supreme Court has held that the use of a defendant's pre-arrest, pre-*Miranda* warnings silence for *impeachment* does not unconstitutionally burden the exercise of a defendant's Fifth Amendment rights. *Jenkins v. Anderson*, 477 U.S. 231, 236-38, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). However, *Jenkins* did not disturb *Griffin's* central holding that a defendant's failure to testify cannot be used as *substantive* evidence of guilt. Further, in *Combs v. Coyle*, 205 F.3d 269, 283-285 (6ᵗʰ Cir. 2000), the Sixth Circuit held that in addition to barring comment an a defendant's failure to testify at trial, the Fifth Amendment bars any substantive use of a defendant's pre-arrest silence as well, and that "the government's use of a defendant's *prearrest silence* in its case in chief is not a legitimate governmental practice." Although *Combs* noted a Circuit split on the question (*Combs* "agree[d] with the reasoning expressed in the opinions of the Seventh,

First, and Tenth Circuits"),[3] it was anchored not only in *Griffin v. California*, but other

Supreme Court cases such as *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32

L.Ed.2d 212 (1972):

> "The Supreme Court has given the privilege against self-incrimination a
> broad scope, explaining that '[i]t can be asserted in any proceeding, civil or
> criminal, administrative or judicial, investigatory or adjudicatory; and it
> protects against any disclosures that the witness reasonably believes could
> be used in a criminal prosecution or could lead to other evidence that might
> be so used.' *Kastigar v. United States*, 406 U.S. 441, 444-45...*see also
> Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118
> (1951)....In a prearrest setting as well as in a post-arrest setting, it is clear
> that a potential defendant's comments could provide damaging evidence
> that might be used in a criminal prosecution; the privilege should thus
> apply."

That *Combs v. Coyle* was based on established Supreme Court precedent is further

evidenced by the fact that the Sixth Circuit applied the ban on substantive use of pre-

arrest silence in the context of a post-AEDPA habeas corpus case.

In Petitioner's case, when the prosecutor referred to "the guilty man being

whispered to by his lawyer," and told the jury "that was guilt working there and guilty

knowledge" (Tr.IV, 14, 114-15), there can simply be no conclusion other than that he was

using the Petitioner's election not to testify at the previous hearing as substantive

evidence of guilt. In fact, Petitioner presents an even stronger showing of a Fifth

Amendment violation than *Combs*, in that here, the "pre-arrest silence" was invoked at a

formal proceeding where Petitioner was represented by counsel, after having been

approached by the police.[4]  The Michigan Court of Appeals  therefore correctly found a

---

[3] *See United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1017 (7th Cir. 1987);
*Coppola v. Powell*, 878 F.2d 1562, 1568 (1st Cir. 1989); *United States v. Burson*, 952
F.2d 1196, 1201 (10th Cir. 1991).  These cases, as well as *Combs*, rely principally on the
Supreme Court's decision in *Griffin*.

[4] Petitioner testified that a Michigan State Police Trooper contacted him at work on
December 18, 1998 (Tr.III, 239).

Fifth Amendment violation.[5]

Given the clearly established constitutional right that the prosecutor violated, there could have been no conceivable reason of trial strategy behind counsel's failure to object. There was no possible advantage to be gained by acquiescing to the testimony and the prosecutorial argument. *Combs v. Coyle, supra*, 205 F.3d at 286, is exactly on point:

> "Defense counsel's failure to object to the unconstitutional use of Combs's "talk to my lawyer statement" clearly fell below an objective standard of reasonableness. Although the contours of the privilege against self-incrimination may sometimes be unclear, *that a defendant's silence cannot be used as substantive evidence against him at trial is a fundamental aspect of the privilege.* Combs's counsel should have realized that the use of Combs's prearrest silence against him was at least constitutionally suspect and should have lodged an objection on that basis. *Counsel's failure to have objected at any point is inexplicable, and we can perceive no possible strategic reason for such failure.* Not only did the failure to object ensure that the jury could use Combs's protected silence against him, but it also guaranteed that both the admission of the statement and the trial court's instruction would be analyzed on review only for plain error. *Counsel's performance with respect to this issue was constitutionally deficient under the Strickland standard.*" (Footnotes omitted) (emphasis added).

Likewise in Petitioner's case, trial counsel's failure to object fell below an objective standard of reasonableness; the first prong of *Strickland* has been met.[6]

### ii.    Prejudice

Reviewing the Fifth Amendment issue for plain error (as it was required to do because of trial counsel's failure to object), the Michigan Court of Appeals found the

---

[5] The prosecutor's comment about "the guilty man being whispered to by his lawyer" was particularly insidious, in that apart from the Fifth Amendment violation, it infringed on the right to counsel and the attorney-client relationship.  In the prosecutor's view, apparently, a defendant with the temerity to seek and follow the advice of counsel does so at his peril.

[6] The Court of Appeals opinion appears to reject the counsel ineffectiveness claim based on the second prong of *Strickland*–prejudice–rather than the first prong. ("[f]or the reasons previously discussed in this opinion, we conclude that defendant has not demonstrated that he was prejudiced by his trial counsel's performance and has not overcome the presumption that his trial counsel rendered effective assistance").

error to be harmless "in light of the overwhelming evidence that was properly admitted from which the jury could find the defendant guilty beyond a reasonable doubt." The Court of Appeal's characterization of the evidence as "overwhelming" is not supported by the record, and indeed is contradicted by its initial observation that "this case presented a credibility contest."[7]

To be sure, there was substantial evidence regarding some collateral facts, for example, how much the Petitioner had to drink on the day in question, and whether he was intoxicated that evening. But even if there were "overwhelming" evidence that the Petitioner was drunk, that is no proof of the charged offense. As to the ultimate question of whether the Petitioner improperly touched his daughter's breast in a way that would constitute second-degree criminal sexual conduct, the evidence was far from "overwhelming."

Ashley Owen testified graphically that the Petitioner was "massaging" and "squeezing" her breast continually for a period of four or five minutes (Tr.I, 308-309). She denied that he might have accidentally brushed the side of her breast while giving her a back rub (Tr.I, 309). She testified that the next morning, she told Dondrea "that when dad was rubbing my back that he had his hand on my chest" (Tr.I, 312).

---

[7] The Court of Appeals' *characterization* of the evidence as overwhelming as part of its harmless error analysis is not itself a "determination of a factual issue" that is entitled to a presumption of correctness under 28 U.S.C. §2254(e)(1). In a harmless error inquiry, the court is retrospectively weighing the inculpatory versus the exculpatory evidence in order to determine the probable effect of the error on the jury; the court is not determining which historical facts are true and which are not. *McGhee v. Yukins*, 229 F.3d 506, 513 (6th Cir. 2000). At most, the Court of Appeals' description of the evidence as "overwhelming" is a mixed question of law and fact, which would *not* be accorded a presumption of correctness, particularly in the context of a *Strickland* issue. *See Ramonez v. Berghuis*__F.3d__, 2007 WL 1730096 (6th Cir. 2007); *Combs v. Coyle, supra*, 205 F.3d at 278 ("Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact").

Every other witness who was present–including Dondrea Hall, who testified for the prosecution–contradicted Ashely's testimony.

Dondrea Hall–who testified in exchange for dismissal of the charges against her–stated that she was present during the back rub incident, but didn't see anything untoward or think that anything was wrong at the time (Tr.III, 20). This was consistent with a "pre-deal" letter she wrote to her attorney, where she said that she never saw the Petitioner touch Ashley's chest (Tr.III, 54-55). She testified that the next morning, Ashley told her that the Petitioner had "touched" her breast during the back rub (Tr.III, 20), not that Petitioner had massaged or squeezed her breast for five minutes. Indeed, after the jury sent a note asking specifically what Ashley said the morning after the incident, Dondrea reiterated that "Ashley told me that Chris [the Petitioner] had touched the side- -touched her breast side, and...um...that it made her very uncomfortable." (Tr.III, 103). She added that Ashley did not say that Petitioner squeezed or manipulated her breast in any way (Tr.III, 104).

Janet Hall, the Petitioner's step-mother, was seated a short distance from Petitioner and Ashley, and was in a position to see them both. She testified that she saw the Petitioner give Ashley a back rub, but did not see him with his hand under Ashley's chest, and never saw him fondle Ashley (Tr.II, 150-153). Although Trooper Watson, who interviewed Janet Hall in December of 1998, impeached parts of Hall's testimony with several prior inconsistent statements (particularly regarding Petitioner's drinking), he testified that Hall did tell her that she did not see the Petitioner fondle Ashley's breast. That statement was, of course, consistent with Hall's trial testimony.

Arthur Hall, the Petitioner's father, was present during the incident, seated four or five feet away from where Petitioner was giving Ashley a back rub (Tr.III, 167-168). He

testified that he did not see Petitioner's hands move toward Ashley's chest, nor did he see anything inappropriate–only "horseplay" between the Petitioner and the other children, who were all making a lot of noise (Tr.III, 170, 171-72).

Amber Stiver, Ashley's friend, was present on the night of the incident, and testified that she saw Petitioner give Ashley a back rub, but nothing else (Tr.III, 155-56). She testified that a couple of months later, Ashley told her that Petitioner had "touched" her breast, but did not say whether it was intentional or accidental (Tr.III, 156).

The Petitioner testified that he did not engage in any inappropriate conduct with Ashley (Tr.III, 201). He said that when Dondrea spoke to him the day after the alleged incident, she said that Ashley claimed he had "grazed" the side of her breast (Tr.III, 225-26). This was consistent with Dondrea's own testimony that Ashley said the Petitioner "touched" her breast, and inconsistent with Ashley's testimony that Petitioner squeezed and massaged her breast for four or five minutes.

The conflict in the testimony–whether Petitioner inadvertently "touched" or "grazed" Ashley's breast, or whether he "massaged" or "squeezed" her breast continuously for five minutes–was critical to the jury's determination of whether the Petitioner was guilty of second-degree criminal sexual conduct. If there was only a brief, accidental contact, the Petitioner is not guilty.[8] On the other hand, if the jurors believed Ashley's testimony that she was fondled for four or five minutes, they would very likely reject the theory of inadvertence, and find that there was "sexual contact." That the jurors were concerned with this distinction is evidenced by their written question regarding what

---

[8] Under M.C.L. 750.520c(1), second-degree CSC requires that the defendant "engage[] in sexual contact with another person." Under M.C.L. 750.520a(k), "sexual contact" is defined as touching that "can reasonably be construed as being for the purpose of sexual arousal or gratification."

Ashley told Dondrea the next morning.

Yet, the only evidence that would "overwhelmingly" support a theory of sexual contact was Ashley's own testimony, which was unimpeachably contradicted by every other witness who was present. Contrary to the Court of Appeals' opinion, the evidence of Petitioner's guilt of second-degree CSC was very close, and boiled down to a credibility contest: five eyewitnesses who saw nothing inappropriate or who heard Ashley describe the contact as merely "touching" or "grazing" versus Ashley's in-court testimony. Perhaps recognizing this, the prosecutor "strategically used [Petitioner's] protected silence" as substantive evidence of guilt, improperly bolstering a case that otherwise would have been considerably weaker. *Combs v. Coyle, supra*, 205 F.3d at 290.

The obstruction of justice and conspiracy charges were similarly problematic. While the evidence against Petitioner was legally sufficient, it was far from overwhelming. According to the testimony of Dondrea Hall and Ashley Owen, it was Victoria Easterday and Dondrea who were the active participants. Dondrea, not the Petitioner, pulled Ashley out of school on the pretext of a doctor's appointment. Easterday, not the Petitioner, came up with the idea of writing a letter to the police. According to Ashley, it was Easterday, not the Petitioner, who told her to say she made the whole thing up. Dondrea, not the Petitioner, saw to it that Ashley wrote three drafts of the letter and read it over the telephone to Easterday.

Counsel's objectively unreasonable failure to object to the testimony and prosecutorial argument undermined "the fundamental fairness of the proceeding," *Strickland*, 466 U.S. at 697, resulting in a verdict of questionable reliability. There is "a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id.* at 694. Petitioner has satisfied both prongs of *Strickland*, and is therefore entitled to a conditional grant of habeas relief. *Combs v. Coyle, supra*, 205 F.3d at 291.

## B. FIFTH AMENDMENT VIOLATION

As an initial matter, the Respondent argues that the Petitioner's substantive Fifth Amendment claim is procedurally defaulted because there was no contemporaneous objection to either the challenged testimony or the prosecutor's argument in the trial court.

In *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), the Supreme described the doctrine of procedural default as follows:

> "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default, and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claim will result in a fundamental miscarriage of justice."

Procedural default may occur if the petitioner failed to present a ground for relief to the state appellate court at his only opportunity to do so. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). It also may occur if Petitioner has not asserted a timely objection at trial. *Paprocki v. Foltz,* 869 F.2d 281, 284-85 (6th Cir.1989); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000). Michigan has a contemporaneous objection rule. *See People v. Grant*, 445 Mich. 535, 546, 520 N.W.2d 123 (1994). The fact that a state appellate court might review the merits of an issue under a more stringent "plain error" or "manifest injustice" standard–as the Court of Appeals did in Petitioner's case– does not excuse a procedural default. *Scott v. Mitchell, supra*.

Again, a prisoner seeking habeas review of a procedurally defaulted issue must satisfy the *Coleman* cause and prejudice test. In *Murray v. Carrier,* 477 U.S. 478, 488,

106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), the Supreme Court held that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  Ineffective assistance of counsel can constitute "cause."  *Id*.

In Section IV-A, we found as an independent, stand-alone claim that Petitioner was denied the effective assistance of counsel, and, applying the AEDPA's standard of review, that the Michigan courts unreasonably applied *Strickland v. Washington*.  In assessing whether a claim of ineffective assistance satisfies the "cause" requirement of *Coleman*, however, a less stringent standard of review is applied.  The question is not whether the state court's decision was unreasonable, but whether there was there an independent Sixth Amendment violation under *Strickland*.  The level of scrutiny, in other words, would be the same as would be applied on direct review.  *Joseph v. Coyle*, 469 F.3d 441, 459 (6th Cir. 2006); *Fischetti v. Johnson,* 384 F.3d 140, 154-55 (3d Cir.2004).

Having already found that Petitioner was denied the effective assistance of counsel under the more demanding AEDPA standard, it follows, *a fortiori*, that he has established cause for excusing the procedural default.  *See Joseph v. Coyle, supra*, 474 F.3d at 459 ("[Petitioner] has established his [ineffective assistance of counsel] claim under the AEDPA standard, which necessarily means that he has also established ineffective assistance of counsel for the purpose of establishing cause.").

Likewise, to establish prejudice under *Coleman*, a petitioner advancing an ineffective assistance claim must make the same showing required to establish that the ineffective assistance itself was prejudicial under *Strickland*.  *Joseph v. Coyle*, 469 F.3d at 462-63 ("[I]t follows that establishing *Strickland* prejudice likewise establishes prejudice for purposes of cause and prejudice").   For the reasons set forth in Section IV-A,

Petitioner has established both cause and prejudice, and this Court may therefore proceed to review the substantive Fifth Amendment issue on its merits.

As discussed above, the Michigan Court of Appeals correctly found that the admission of testimony and the argument of the state as to Petitioner's failure to testify at the Probate Court hearing was a Fifth Amendment violation. The clearly established constitutional basis of the error has been fully discussed in Section IV-A, and need not be repeated her. However, the Court of Appeals denied relief, finding that the error was harmless.

On collateral review, the standard for showing that an error was not harmless is more stringent than on direct review. On direct review, the state has the burden of showing that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). On habeas review, however, the petitioner must establish that the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Fry v.* Pliler, __ U.S.__, 127 S.Ct. 2321, __L.Ed.2d__ (2007); *Vasquez v. Jones*,__F.3d__ (6th Cir. Docket No. 07-0280, rel'd 7-24-07).[9]

If an error meets the "prejudice" standard of *Strickland*, it necessarily meets the "substantial and injurious effect" standard for harmless error set forth in *Brecht*. In *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court held that " 'a reasonable probability that, ... [but for the error], the result of the

_____

[9] Prior to the Supreme Court's decision in *Fry*, the Sixth Circuit had held that where, as in this case, the state court undertook a *Chapman* harmless error analysis, the AEDPA replaced *Brecht* with an inquiry as to whether the state's conclusion regarding harmless error was itself unreasonable. *Eddleman v. McKee*, 471 F.3d 576, 583 (6th Cir. 2006). This test was phrased as "*Chapman* plus AEDPA deference." *Id.* In *Vasquez*, the Sixth Circuit recognized that *Fry* overruled *Eddleman*, and that the harmless error test in all habeas cases is the "substantial and injurious effect" standard of *Brecht*.

proceeding would have been different' ... necessarily entails the conclusion that" there was a " 'substantial and injurious effect or influence in determining the jury's verdict....'" (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J.). The Sixth Circuit has held likewise. *See Combs v. Coyle, supra*, 205 F.3d at 291 (citing *Kyles,* 514 U.S. at 435-36).

Furthermore, in *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995), the Supreme Court held that "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *Accord, Vasquez v. Jones, supra*. The *O'Neal* Court stated that "grave doubt" meant that "in the judge's mind, the matter is so evenly balanced that he feels himself virtually in equipoise as to the harmlessness of the error." *O'Neal.*, 513 U.S. at 435.

The Petitioner having shown *Strickland* prejudice for the reasons set forth in Section IV-A, he has perforce met his burden of showing that the Fifth Amendment error was not harmless under the standard of *Brecht v. Abrahamson*. As well, Petitioner easily meets the "grave doubt" test of *O'Neal v. McAninch*. Therefore, because the Michigan Courts unreasonably applied *Griffin v. California, supra*, and because the error had a "substantial and injurious effect or influence in determining the jury's verdict," Petitioner is entitled to a conditional writ of habeas corpus.

## C. PROSECUTORIAL MISCONDUCT

The Petitioner claims several instances of prosecutorial misconduct, including pervasive and thematic commentary on his character, along with improper exploitation of his failure to testify at the Probate Court hearing. None of the challenged comments were objected to at trial. Thus, the issue is procedurally defaulted, unless Petitioner can show

cause and prejudice under *Coleman v. Thompson*, as discussed above.

Were it only the prosecutor's "character" references–e.g., the Petitioner's drinking, the spectre of domestic abuse, etc.–this case would present a much closer question, both as to the cause and prejudice formulation and the underlying substantive error. However, the prosecutor's constitutionally impermissible references to the Petitioner's failure to testify are much more compelling.

For the reasons discussed in the preceding section, the ineffective assistance of trial counsel satisfies the "cause" prong of *Coleman*. The "prejudice" prong is satisfied for the same reasons, discussed below, that the prosecutor's argument constitutes prejudicial constitutional error under the standard of *Brecht v. Abrahmson* and *O'Neal v. McAninch*.

To merit habeas relief on a prosecutorial misconduct issue, the Petitioner must show that "the statements of the prosecutor so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Simpson v. Jones,* 238 F.3d 399, 409 (6th Cir.2000); *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "To satisfy this standard, the conduct must be both improper and flagrant." *Broom v. Mitchell,* 441 F.3d 392, 412 (6th Cir.2006); *Bates v. Bell,* 402 F.3d 635, 641 (6th Cir.), *cert. denied,* --- U.S. ----, 126 S.Ct. 163, 163 L.Ed.2d 150 (2005). Conduct is improper if made "to incite the passions and prejudices of the jurors...." *United States v. Solivan,* 937 F.2d 1146, 1151 (6th Cir.1991). If conduct is found to be improper, the court considers four factors to determine whether it was flagrant: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against

the defendant." *Bates,* 402 F.3d. at 641.

As set forth in the preceding two sections, the prosecutor's remarks regarding the Petitioner's assertion of his Fifth Amendment right were highly prejudicial. As to the second factor, the remarks and the testimony were extensive. Marie Iott testified that all parties present at the Probate Court proceeding had the opportunity to argue their positions (Tr.II, 252). Det. Kellogg testified that Petitioner, who was at the hearing with his attorney, did not testify (Tr.III, 141-142). In cross-examining the Petitioner, the prosecutor not only questioned him about his failure to testify, but berated his attorney's advice, implying that it would be more natural for the Petitioner to ignore it (Tr.III, 289-290). In his initial closing argument, the prosecutor referred twice to the Petitioner's silence, including the "it was the guilty man" comment discussed above (Tr.IV, 14, 26), and then referred to it yet again in his rebuttal argument (Tr.IV, 114-15). These were not isolated or inadvertent comments; rather, the prosecutor wove the Fifth Amendment violation into the very fabric of his case.

As to the third factor, the prosecutor's repeated comments that Petitioner's silence at the Probate Court hearing were substantive evidence of guilt were, beyond question, "'manifestly intended' to comment on [Petitioner's] failure to testify." *Jewett v. O'Dea*, 94 F.3d 1312, 1999 WL 1023744, *5 (6th Cir. 1999)(unpublished decision).

Finally, as discussed in Section IV-A, the strength of the state's proofs as to the elements of the charged offenses was far from overwhelming. The Sixth Circuit's observations in *Gravley v. Mills* 87 F.3d 779, 790 (6th Cir. 1996) are *apropos*:

> "In short, we do not find this to be a case where the evidence of guilt against the accused was overwhelming. The facts by themselves do not affirmatively prove [Petitioner's] guilt or innocence. It is clear that [Petitioner's] credibility, or lack thereof, was the dominant factor behind his conviction. However, the jury was never allowed to simply weigh the conflicting testimonies of the parties. Instead, it was reminded over and

over again that if [Petitioner's] version of events was really true he certainly would have come forward earlier. In the face of such misconduct, we simply cannot conclude the conviction was attained through a fair judicial process. *See Martin v. Parker,* 11 F.3d 613, 617 (6th Cir.1993) ('[W]here, as here, the evidence of guilt is at best conflicting, egregious prosecutorial misconduct of this kind rises to the level of a constitutional deprivation, denying the defendant a fundamentally fair trial.'); *see also United States v. Payne,* 2 F.3d 706, 712 (6th Cir.1993); *Sims v. Livesay,* 970 F.2d 1575, 1581 (6th Cir.1992) ( 'This is not a case where the evidence of the [Petitioner's] guilt was so massive or multilayered as to render harmless defense counsel's errors.')."

Because of this flagrant prosecutorial misconduct, Petitioner is entitled to a conditional writ of habeas corpus.

## D.   OTHER ISSUES

Petitioner argues that he was denied the due process right to a fair trial by the admission and exploitation of irrelevant and highly prejudicial evidence (Issue II). This assignment of error cannot form the basis of habeas relief, for two reasons. First, state law evidentiary errors are not cognizable on federal habeas review. *Estelle v McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 Led.2d 385 (1991). Secondly, insofar as Petitioner contends that the cumulative effect of the errors led to a due process violation, that issue is likewise not cognizable in a habeas case:

> "Nonetheless, the law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue. *See Moore v. Parker,* 425 F.3d 250, 256 (6th Cir.2005) (discussing cumulated evidentiary errors). No matter how misguided this case law may be, it binds us."

*Williams v. Anderson* 460 F.3d 789, 816 (6th Cir. 2006).

Finally, Petitioner challenges his sentence (Issue IV). To the extent that the issue is grounded in state sentencing law, it is not cognizable on federal habeas review. *Estelle v. McGuire, supra.* To the extent that it is based on the due process right to be sentenced on the basis of accurate information, the issue must also be rejected. First, the claimed

-28-

error flows from the trial judge's failure to respond to defense challenges to certain information in the Sentencing Information Report (SIR). He made no definitive finding that the information was in fact inaccurate. More importantly, the Court of Appeals found that "the record shows that the trial court did not ground its ruling in the claimed three inaccuracies in the PSIR." We agree. Notwithstanding Petitioner's characterization of the sentencing judge's comments, it does not appear that the challenged information in the SIR had any significant impact on the sentence.

## V.   CONCLUSION

I recommend that a conditional writ of habeas corpus be GRANTED. I further recommend that if a date for a new trial is not scheduled within 90 days, Petitioner be unconditionally released.

Any objections to this Report and Recommendation must be filed  within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20)

pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


        s/R. Steven Whalen
        R. STEVEN WHALEN
        UNITED STATES MAGISTRATE JUDGE

Dated:  July 25, 2007

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 25, 2007.


        s/Susan Jefferson
        Case Manager